J-A05010-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA   :   IN THE SUPERIOR COURT OF
                                         :             PENNSYLVANIA

                        Appellee        :

                                        :

                  v.               :

                                        :

CHRISTIAN CONSTANTINI          :

                                        :

                       Appellant      :           No. 790 WDA 2016

Appeal from the Judgment of Sentence December 22, 2015
In the Court of Common Pleas of Allegheny County
Criminal Division at No(s):  CP-02-CR-0001446-2015

BEFORE:   GANTMAN, P.J., BENDER, P.J.E., and MOULTON, J.

MEMORANDUM BY GANTMAN, P.J.:              **FILED MARCH 08, 2017**

Appellant, Christian Constantini, appeals from the judgment of sentence entered in the Allegheny County Court of Common Pleas, following his bench trial convictions for simple assault, recklessly endangering another person, official oppression, and criminal conspiracy.[1]  We affirm.

In its opinion, the trial court fully and correctly set forth the relevant facts and procedural history of this case.  Therefore, we have no reason to restate them.

Appellant raises the following issues for our review:

> WHETHER THE [TRIAL] COURT COMMITTED AN ERROR OF
> LAW OR ABUSED ITS DISCRETION BY IGNORING ACT 49
> OF 2009 TITLE 44, AND THE CONSTABLE'S AUTHORITY TO

---

[1] 18 Pa.C.S.A. §§ 2701(a)(1); 2705; 5301(1); 903(c), respectively.

TAKE [VICTIM] INTO CUSTODY AND TRANSPORT FORTHWITH[?]

WHETHER THE [TRIAL] COURT COMMITTED AN ERROR OF LAW OR ABUSED ITS DISCRETION BY IGNORING PENNSYLVANIA CRIMES CODE TITLE 18 § 508(A)(1)(I)[?]

WHETHER THE [TRIAL] COURT COMMITTED AN ERROR OF LAW OR ABUSED ITS DISCRETION BY IGNORING PENNSYLVANIA RULES OF CRIMINAL PROCEDURE, RULE 431(B)(1)(A-C)[?]

WHETHER THE [TRIAL] COURT COMMITTED AN ERROR OF LAW OR ABUSED ITS DISCRETION BY IGNORING OR THE MISAPPLICATION OF FACT[?]

WHETHER THE [TRIAL] COURT COMMITTED AN ERROR OF LAW OR ABUSED ITS DISCRETION BY IGNORING THE POWER OR THE ABILITY OF THE INDIVIDUAL OFFICER'S DISCRETION[?]

(Appellant's Brief at 5).[2]

After a thorough review of the record, the briefs of the parties, the applicable law, and the well-reasoned opinion of the Honorable Beth A. Lazzara, we conclude Appellant's issues merit no relief. The trial court opinion comprehensively discusses and properly disposes of the questions presented. (*See* Trial Court Opinion, filed April 29, 2016, at 12-33) (finding: while constables possess power to arrest for unpaid parking tickets, Appellant and co-defendant's convictions stem from egregious manner in

---

[2] The statute at 18 § 508(a)(1)(i) refers to the use of force in law enforcement, allowing use of force in lawful arrest where necessary to effect the arrest but limiting the use of deadly force; Pa.R.Crim.P. 431(B)(1)(A-C) covers the procedure for enforcing an arrest with a warrant in a summary case.

which they executed arrest, as well as gross abuse of power they demonstrated in connection with what was ultimately unnecessary arrest; constable handbook expressly provides that constables **must** accept payment if defendant is able to pay; constables shall take defendants into custody **only** when payment cannot be made; nothing in constable handbook restricts constables' ability to accept payment by cash or check; constables often take personal checks and many have "swipe cards" on their cell phones which allow payment by credit card; constables may also transport defendant to ATM to collect payment on warrant; arrest warrant itself gave Appellant and co-defendant ability to accept payment at Victim's home; Rule 431 also states constables' authority to transport defendant to court is restricted only to situations where defendant is unable to make payment of any type; Appellant and co-defendant had direct financial motive to take Victim into custody and bring her to court because they are paid more if they physically bring defendant to court, and they do not get paid until personal check offered from defendant clears; Appellant and co-defendant violated procedure outlined in Rule 431 and their convictions stem not only from Victim's unnecessary arrest, given her ability to pay, but also from Appellant and co-defendant's hyper-aggressive conduct and gross mistreatment of Victim; Victim and her daughter both testified they made numerous attempts to pay via various methods, and Appellant and co-defendant refused to tell them amount owed; Appellant and co-defendant

also refused to produce paperwork or actual warrant at issue to Victim or her daughters; Victim's daughters said Appellant crumpled up check and confirmed Victim's statements that co-defendant grabbed Victim's foot and dragged Victim out of house; Appellant handcuffed Victim, pushed her several times towards the front door, and pulled Victim backwards and down to the ground using handcuffs; Appellant and co-defendant deliberately placed Victim improperly into police vehicle because she was positioned on her side and no attempt was made to sit her upright, which violates mandated policy and could have caused serious bodily injury to Victim; testimony from Victim and her family members was consistent, highly credible, and worthy of belief; court rejected Appellant's version of events as unbelievable or incredible, Appellant's version of events was contrived, self-serving, and completely unworthy of belief; Appellant came across as disingenuous, sarcastic, combative, and arrogant; court also personally witnessed co-defendant Lowman's temper flare during trial; Appellant's testimony was also inconsistent with notes he prepared on day following incident; evidence was sufficient to sustain Appellant's convictions, and verdict was not against weight of evidence).  Accordingly, we affirm on the basis of the trial court's opinion.

Judgment of sentence affirmed.

J-A05010-17

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 3/8/2017

# IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA
## CRIMINAL DIVISION

COMMONWEALTH OF PENNSYLVANIA,         CC# 2015-1446

v.

CHRISTIAN CONSTANTINI,

Defendant.



COMMONWEALTH OF PENNSYLVANIA,         CC# 2015-1423

v.

MICHAEL LOWMAN,

Defendant.



OPINION

BETH A. LAZZARA, JUDGE
Court of Common Pleas

Copies Sent To:

Mike Streily, Esquire
Office of the District Attorney
Allegheny County Courthouse
Pittsburgh, PA 15219

Lawrence E. Bolind, Jr., Esquire
238 Main Street
Imperial, PA 15126

# IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA

## CRIMINAL DIVISION

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | ) | CC # 2015-1446 |
| | ) | |
| v. | ) | |
| | ) | |
| CHRISTIAN CONSTANTINI, | ) | |
| | ) | |
| Defendant | ) | |
| | ) | |
| | ) | |
| COMMONWEALTH OF PENNSYLVANIA | ) | CC # 2015-1423 |
| | ) | |
| v. | ) | |
| | ) | |
| MICHAEL LOWMAN, | ) | |
| | ) | |
| Defendant. | ) | |

## **OPINION**

This is a direct appeal following the judgment of sentence that was entered on December 22, 2015, following a non-jury trial that took place between September 22, 2015, and September 25, 2015. The Defendants were charged with Simple Assault (18 Pa. C.S.A. §2701(a)(1) (Count One); Recklessly Endangering Another Person (18 Pa. C.S.A. §2705) (Count Two); Official Oppression (18 Pa. C.S.A. §5301(1)) (Count Three); and Criminal Conspiracy (18 Pa. C.S.A. §903) (Count Four). After meaningful consideration of the evidence and arguments that were presented at the non-jury trial, this court found the Defendants guilty of all counts on September 29, 2015. Sentencing was scheduled for December 22, 2015 to allow for the preparation of Presentence Investigation Reports.

1

On October 9, 2015, Lawrence E. Bolind, Jr., Esq. entered his appearance on behalf of both Defendants and filed a "Motion to Stay Court Proceedings," an "Application for Emergency Stay of Trial Court Proceedings," and a "Motion for Post-Conviction Relief" in each case. Counsel also filed a Notice of Appeal in the Superior Court of Pennsylvania that same day. Given that the Notice of Appeal was premature since it had been filed prior to the imposition of sentence, the Commonwealth filed in the Superior Court of Pennsylvania a "Motion to Quash Appeal" on October 20, 2015. The Superior Court granted relief and quashed the appeal on November 10, 2015.

In light of the Defendants' decision to proceed with Attorney Bolind, trial counsel for each Defendant sought leave to withdraw from the case. On December 3, 2015, a hearing was held to address these motions, as well as the motions that were filed by Attorney Bolind. At the conclusion of the hearing, this court granted trial counsels' motions to withdraw, and denied the Defendants' motions to stay proceedings. The motions for post-conviction relief were denied without prejudice to refile at the appropriate time (i.e. after the judgment of sentence was imposed).

On December 22, 2015, Defendant Constantini was sentenced to a two (2) year term of probation at Count One (Simple Assault) and a consecutive one (1) year term of probation at Count Three (Official Oppression). No further penalty was imposed at the remaining counts of conviction. The Defendant was ordered to have no contact with the victim, Esther Peyton, her husband, her children, and her residence. Court costs were also imposed. Defendant Lowman was sentenced to a two (2) year term of probation at

2

Count One and a consecutive two (2) year term of probation at Count Three. The Defendant was ordered to have no contact with the victim, Esther Peyton, her husband, her children, and her residence. Court costs were imposed.

Post-sentence motions subsequently were filed, and a post-sentence hearing was scheduled to take place on February 3, 2016. However, on January 21, 2016, the Defendants filed a Notice of Appeal and divested the court of jurisdiction to entertain the post-sentence motions.

On February 18, 2016, the Defendants each filed a timely Concise Statement of Matters Complained of on Appeal ("Concise Statement"), raising numerous issues for review. In essence, the Defendants allege that this court erred by misapplying and/or misinterpreting the law relating to constables and their arrest powers and by misapplying the facts of the case. (Concise Statement, pp. 1-3). The Defendants also challenge the weight and sufficiency of the evidence. (Id. at 3).

The allegations of error raised by the Defendants are without merit. For the reasons set forth below, this court did not commit error in finding the Defendants guilty of the charged offenses. Additionally, the evidence was more than sufficient to convict the Defendants of the charged offenses, and the verdicts were not against the weight of the evidence.

## I. FACTUAL BACKGROUND

On October 14, 2014 at approximately 3:00 p.m., the victim, Esther Peyton, was at home with her five-year old grandson and her two daughters, Kimberly and Christina, when she heard a knock on her door. (Trial Transcript ("TT"), 9/22/15-9/24/15, pp. 27-28, 67). With her grandson by her side, Mrs. Peyton opened her door and saw two (2) men, whom she later identified as the Defendants, dressed in blue jumpsuits. (TT, pp. 28, 57, 68-69). Mrs. Peyton asked the Defendants how she could help them, and Defendant Lowman stated that "they had an arrest warrant for an Esther Peyton." (TT, pp. 28-29, 55, 69-70). After being told that the warrant was for unpaid parking tickets, Mrs. Peyton believed that something was not right because she had never before received any sort of parking or driving ticket. (TT, p. 29). She attempted to explain to the Defendants that she did not have any outstanding tickets, and she told them that her third daughter, Melissa, had some tickets, but that she was not at home. (TT, pp. 27, 29, 55). Realizing that the situation would need to be addressed at greater length, Mrs. Peyton told the Defendants that she would be right back so that she could place her grandson in front of the TV and ensure that her dog was secured. (TT, pp. 30, 59, 70).

Mrs. Peyton closed the front door and immediately asked her daughter Kimberly Peyton, who had been downstairs, whether she had any unpaid parking tickets. (TT, p. 30). Kimberly came upstairs to the kitchen to speak with her mother and answered that she did not have any outstanding tickets. (TT, pp. 30, 72, 100-101). Before mother and daughter could finish their conversation, they heard the sound of their dog barking, which was unusual. (TT, pp. 30-31, 72, 101). The dog was restrained in the back yard,

4

so Mrs. Peyton and Kimberly looked out the kitchen window into the back yard and saw Defendant Lowman standing there with his gun drawn on the dog. (TT, pp. 30, 57, 70-72, 101-102, 127-28).

At the same time that Mrs. Peyton saw Defendant Lowman with his gun drawn, she heard someone pounding on the front door. (TT, pp. 31, 57). Only a minute or two had passed since she had closed the door and told the Defendants that she would be right back. (TT, p. 31). After seeing Defendant Lowman with his gun drawn and hearing the pounding on her door, Mrs. Peyton and Kimberly became very frightened and Mrs. Peyton decided to call her cousin, Chris Deasy, for advice on, and understanding of, the situation. (TT, pp. 31-32, 92, 102). Mr. Deasy at the time was the Chief of Police of West Homestead and lived very close by. (TT, pp. 31-32, 55, 57-58, 72, 92). Mrs. Peyton informed Chief Deasy of the situation and told him that she did not know what was going on. (TT, p. 31). She relayed to him that there was a man in the back yard with a gun drawn and a man pounding at the front door and that the men had said something about tickets. (TT, pp. 31-32). After speaking briefly with her cousin, Mrs. Peyton partially opened the front door and handed the phone, with Chief Deasy still on the line, to Defendant Constantini. (TT, pp. 33-35, 72, 103). She explained that her cousin was the Chief of Police of West Homestead, and she asked the Defendant if he could please talk to Chief Deasy and explain what was happening. (TT, p. 33).

Defendant Constantini grabbed the phone from Mrs. Peyton's hand and "went ballistic." (TT, pp. 33-34). He hung up the phone, began screaming, yelling and

5

swearing, and said that he does not "have to F'ing talk to anybody." (TT, pp. 34, 103). At that point, Defendant Constantini shoved the door open on Mrs. Peyton, who had been standing partially behind the door. (TT, pp. 34, 73, 103-104). The force with which the Defendant shoved the door had the effect of pushing Mrs. Peyton backwards towards her kitchen. (TT, pp. 35, 73). Defendant Constantini entered the home and began telling Mrs. Peyton that she was "going to jail." (TT, pp. 35, 104). Mrs. Peyton was frightened by the Defendants' behavior. (TT, pp. 35-36, 104-05).

Although Mrs. Peyton was still confused about the outstanding parking tickets, she told Defendant Constantini that she was able to, and would, pay for any kind of ticket. (TT, pp. 36, 75). Specifically, Mrs. Peyton said, "I don't know what this is about," and "I don't know who the tickets are [for]', but "I can pay for any of the tickets. I can pay for them. I can give you a check. I can give you cash. I can give you a credit card. I can pay for the tickets." (TT, pp. 36, 75-76). Despite Mrs. Peyton's pleas, Defendant Constantini did not acknowledge her repeated offers to pay the outstanding tickets and instead kept telling her that she was going to jail. (TT, p. 36).

Kimberly Peyton was also pleading with Defendant Constantini. She attempted to inform him that they were willing and able to pay for the ticket, and she asked Defendant Constantini how much money was owed. (TT, pp. 36, 76, 105, 107-08, 115). Further, Kimberly Peyton asked whether she could see the paperwork relating to the situation. (TT, pp. 36, 105). Instead of answering her questions, Defendant Constantini

6

told her that he did not have to show her anything, and he threatened to arrest her as well. (TT, pp. 36-37,105).

After ignoring the repeated offers by both Mrs. Peyton and Kimberly to make payment, Defendant Constantini placed Mrs. Peyton in handcuffs. She was still in the kitchen when this occurred. (TT, pp. 36, 75-76, 129). As she was being cuffed, Mrs. Peyton was crying, and she continued to beg the Defendants to let her pay the tickets. (TT, pp. 39, 75). Defendant Lowman entered the kitchen shortly after Mrs. Peyton was handcuffed and also refused to acknowledge Mrs. Peyton's offers to make the payment. (TT, pp. 37, 77). Neither of the Defendants ever showed Mrs. Peyton any paperwork relating to the ticket or the warrant. (TT, pp. 53-54, 78).

At one point during this ordeal, Defendant Constantini told Kimberly that she could pay the ticket. Kimberly immediately left the kitchen and ran downstairs to retrieve a check. (TT, p. 77, 105-06, 119). Kimberly wrote a check for $1500 because the Defendants refused to give her an amount for the ticket, even though she had asked for the amount multiple times. (TT, pp. 106, 117-18). Kimberly assumed that the ticket had to be for an "outlandish amount" since the Defendants were arresting her mother. Therefore, she wrote a check for the entire amount of money that she had in her bank account. (TT, p. 106). However, by the time Kimberly came back upstairs with the check, her mother was already in the entryway, being moved towards the front door. (TT, pp. 77, 106). Kimberly attempted to hand Defendant Constantini the check, but he threw it on the ground and told her "we don't accept checks." (TT, pp. 107, 144).

7

Kimberly told Defendant Constantini that she could pay with cash, a debit card, or a credit card, and she even offered to go to the ATM machine that was located only three (3) blocks from the house. (TT, pp. 107-08, 115). Defendant Constantini responded by pushing Kimberly and saying "If you don't get out of my way, I'm going to take you to jail too." (TT, pp. 108, 111, 120).

As the situation was unfolding, Mrs. Peyton's ten-year old daughter, Christina, heard the commotion and came downstairs to see what was happening. (TT, pp. 38-39, 108, 136). She started crying when she saw her mother in handcuffs. (TT pp. 139, 141). Christina heard Defendant Constantini tell her mother that she was under arrest and that she was going to jail. (TT, p. 142). Mrs. Peyton instructed Christina to go back upstairs to her room because she did not want her young daughter to witness the situation. (TT, pp. 39-40, 143). Christina walked back upstairs, but she did not go back to her room. Instead, she remained at the top of the stairs by the balcony, which overlooked the front door. (TT, pp. 40-41, 143).

As Mrs. Peyton was being escorted out of the kitchen and towards the front door, she repeatedly told the Defendants that the handcuffs were hurting her and causing her substantial pain because they were put on too tight. (TT, pp. 40-41). Christina overheard her mother's complaints and was crying hysterically. (TT, pp. 42, 108). She yelled down to the Defendants, "You're hurting my mom. You're hurting my mom. Let my mom go." (TT, pp. 40-42, 108). Christina also was able to see Defendant Constantini take the check that was offered by Kimberly, crumple it up, and throw it to

8

the ground. (TT, p. 144). Christina knew that Kimberly had offered a check because she could see that "it was blue and had lines." (TT, p. 144).

As Mrs. Peyton was escorted towards the front door, Defendant Constantini was positioned next to her, holding her by the arm and shoulder. (TT, pp. 41, 79-80, 109). Defendant Lowman was a few feet ahead of them in the entryway. (TT, pp. 41, 79-80). Kimberly saw Defendant Constantini push her mother multiple times as they were walking. (TT, p. 109). As Mrs. Peyton was telling Christina to go inside of her room, she felt Defendant Constantini pull her backwards and down to the ground. (TT, pp. 40-42, 61-62, 82, 108). Mrs. Peyton fell and landed hard on her rear-end and hands. (TT, pp. 42, 62, 82-83, 108-09,114-15, 144).

As a result of being pulled down backwards, Mrs. Peyton's foot reflexively went up into the air. (TT, pp. 43, 82, 86, 146). Instead of helping Mrs. Peyton back up to her feet, Defendant Lowman grabbed her right foot and pulled her across the entryway floor and outside of the front door of the house, pulling her down the step between the front door and the outside landing. (TT, pp. 43, 83-84, 86-87, 108, 113-14, 146, 147). While this was occurring, Mrs. Peyton implored the Defendants to "Please just let me walk. Please just let me walk." (TT, pp. 43, 87). Defendant Lowman let go of Mrs. Peyton's foot, and Defendant Constantini picked Mrs. Peyton up by her arms and allowed her to walk to the vehicle. (TT, pp. 43, 111-12).

9

When Defendant Constantini placed Mrs. Peyton inside the vehicle, he laid her on her left side, instead of placing her in an upright and seated position, and he did not secure her with a seatbelt. (TT, pp. 43, 87-88, 300, 391). Mrs. Peyton remained in that position for the entirety of the ride. She was terrified and assumed that this was how she was supposed to be positioned. Additionally, she was never told to sit up. (TT, pp. 44, 88). Throughout the ride, Mrs. Peyton did not know where the vehicle was going. She assumed that she was being taken to the Allegheny County Jail because that is what Defendant Constantini had repeatedly told her in front of her children. (TT, pp. 35-36, 45, 104, 142). For the entirety of the ride, Mrs. Peyton was crying, and her hair caught in her mouth since she was lying on her left side. (TT, pp. 44-45, 88). She tried telling the Defendants that she was having trouble breathing and that she was getting sick because she was crying and choking on her hair, but the Defendants repeatedly told her to shut up and turned up the volume on their radio. (TT, pp. 45, 88).

When they arrived at Pittsburgh Municipal Court, Defendant Constantini removed Mrs. Peyton from the vehicle and switched her handcuffs around so that she was cuffed from the front in a waist chain belt. (TT pp. 44, 46, 302). Mrs. Peyton was visibly distraught and upset when they entered the courtroom, a fact noted by the presiding judicial officer. (TT, pp. 46, 63). Mrs. Peyton saw that Chief Deasy, was in the courtroom, along with Officer Campbell, the Chief of Police of Munhall, the municipality in which her home is located. (TT, pp. 47, 174). Mrs. Peyton heard Chief Deasy ask Defendant Constantini for the paperwork related to her arrest, but the Defendant refused to provide him with it. (TT, pp. 47, 175, 179). When she was finally brought

10

before the magisterial district judge, Mrs. Peyton heard the judge say to the Defendants, "You brought her down here for a $50 parking ticket?" (TT, p. 48). Mrs. Peyton completed some paperwork and was released from custody shortly thereafter. (TT, pp. 48, 67).

That evening, Mrs. Peyton went to Presbyterian Hospital with her daughter Kimberly because she was experiencing numbness in her right wrist. (TT, pp. 48-49). Mrs. Peyton's husband also took photographs of the redness, bruising, and abrasions that resulted from the incident. (TT, pp. 50-52); (Commonwealth Exhibits 1 through 7). Mrs. Peyton subsequently followed up with a neurologist for suspected nerve damage to her right wrist, and she was informed that it could take months for the numbness in her wrist to resolve, if it resolved at all. (TT, pp. 48-49, 60). At the time of trial, Mrs. Peyton and her physician were taking a "wait and see" approach to determine if the numbness was permanent. (TT, p. 49).

Mrs. Peyton eventually learned that her daughter Kimberly had incurred the parking ticket that was at issue. (TT, pp. 64, 129). The vehicle that incurred the ticket was registered to Mrs. Peyton, but her daughter Kimberly had the vehicle in her possession at the time. Mrs. Peyton ultimately paid the outstanding ticket that had been issued in her name as a result of her daughter's parking violation. (TT, pp. 64-65, 129).

11

## II.  DISCUSSION

### A. This court did not misapply or misinterpret the law with respect to constables and their arrest powers, and it did not misapply the facts in reaching its verdict.

As an initial matter, this court is compelled to note that it did not "misapply" the facts in this case simply because it ultimately rejected the Defendants' versions of events.  Rather, this court was charged with the duty of finding the facts, and, as the fact-finder, it ultimately concluded that the testimony provided by the Peyton family was consistent, highly credible, and worthy of belief.  This court rejected the Defendants' versions of events as not believable or credible.  This court was well within its duty and power to assess the credibility of the witnesses and to choose to believe some and disbelieve others.

Furthermore, the court is well aware that, as a general matter, constables possess the power to arrest individuals over unpaid parking tickets.  However, the Defendants' allegations of error set forth in paragraphs (1) through (6) of their Concise Statements entirely overlook the fact that the basis for their convictions stems not from their lack of authority to effectuate the arrest in question, but rather from the egregious manner in which the arrest was executed, as well as the gross abuse of power that was demonstrated in connection with what ultimately was an unnecessary arrest.

Indeed, notwithstanding the Defendants' power to arrest an individual over an unpaid parking ticket, the incident that occurred on October 14, 2014 easily could have been avoided if the Defendants did not abuse their power and simply complied with the

12

directives set forth in the Allegheny County Constable Handbook (Commonwealth's Exhibit 11) and in Pa. R. Crim. P. 431(B)(1)(c). The Constable Handbook directs that the constables MUST accept payment if the defendant is able to pay. Specifically, Section Four, Part II (Summary Arrest Warrants Procedures), subsections (A) and (B) state in relevant part:

A. Issuance Procedures

**If the defendant is able to pay:**

1. Warrant is issued to a particular constable.

2. When the constable makes contact with the defendant, the constable **must accept from the defendant a signed guilty plea and the full amount of the fine and costs if stated on the warrant;** or

3. **Accept from the defendant a not guilty plea and the full amount of collateral if stated on the warrant.**

B. When Constable Should Bring Defendant in Custody to PMC

1. When a constable serves a summary arrest warrant and **has a person in custody that is not able to pay pursuant to Pa. R.Crim. P. 431 (B)(1)(c)** and the original issuing authority is unavailable the constable **may** bring the defendant to PMC.

2. The constable should bring the person to Arraignment Courtroom #1 and notify a staff member.

3. The constable must have a copy of the arrest warrant and if possible

13

accompanying paperwork such as a signed copy of a citation or criminal complaint.

(TT, pp. 212-14) (emphasis added).[1] This handbook is drafted by the Fifth Judicial District Court of Pennsylvania and is made available to the constables both online and in hard copy form. (TT, pp. 210-211).

Pa. R. Crim. P. 431(B)(1) further makes clear that constables SHALL accept payment in situations where the defendants are able to pay and SHALL take the defendant into custody only when payment cannot be made:

(B) *Arrest Warrants Initiating Proceedings*

(1) When an arrest warrant is executed, the police officer **shall** either:

(a) accept from the defendant a signed guilty plea and the full amount of collateral if stated on the warrant;

(b) accept from the defendant a signed not guilty plea and the full amount of collateral if stated on the warrant; or

(c) **if the defendant is unable to pay**, cause the defendant to be taken without unnecessary delay before the proper issuing authority.

Pa. R. Crim. P. 431(B)(1)(a)-(c) (emphasis added).

With respect to the manner of payment, Detective Darrel Parker, who is employed by the Allegheny County District Attorney's Office and is responsible for

---

[1] See also (https://www.alleghenycourts.us/downloads/administration/ConstableHandbook.pdf) (last visited April 19, 2016).

14

overseeing matters relating to constables, explained that there are "several ways to [obtain] payment on a warrant" and that there is nothing in the Constable Handbook that would restrict the constable's ability to accept payment by cash or check. (TT, pp. 214-15, 222). He confirmed that constables often take personal checks, and many of them even have "swipe cards" on their cell phones which allows defendants to pay with a credit card. (TT, pp. 214-15, 222). He confirmed that constables are even permitted to transport a defendant to an ATM in order to collect payment on the warrant. (TT, pp. 215, 222).

Notwithstanding the language of the Constable Handbook and Pa. R. Crim. P. 431, the Defendants will attempt to argue that the actual arrest warrant gave them the authority to transport Mrs. Peyton to municipal court in lieu of accepting payment at the residence. The Arrest Warrant for Esther Peyton was issued by the County of Allegheny and states the following:

TO THE SERVER: Christian Constantini

In the name of the Commonwealth of Pennsylvania, you are commanded to take the defendant, Esther Peyton, into custody. When the defendant is taken into custody, either (a) accept a signed guilty plea and the full amount of fines and costs, (b) accept a signed not guilty plea and the full amount of collateral, or (c) bring the defendant before me at the court address shown above to answer the Commonwealth upon the complaint or citation of Becky L. McKown charging the defendant with the offense(s) set forth above and further to be dealt with according to law.

(Commonwealth's Exhibit 10) (TT, pp. 209-10). While the arrest warrant does not contain the same qualifying language as the Constable Handbook and Pa. R. Crim. P. 431, the warrant itself clearly gave the Defendants the ability to accept payment at Mrs.

15

Peyton's home. Moreover, the Constable Handbook, in conjunction with Pa. R. Crim. P. 431, unequivocally qualifies the language of the warrant and makes clear that a constable's ability to transport a defendant to court is restricted to situations where a defendant is unable to make any type of payment. (TT, p. 221). While the Constable Handbook may be considered as advisory, surely the same cannot be said of the Rules of Criminal Procedure.

The Defendants had a direct financial motive to take Mrs. Peyton into custody and transport her to municipal court, as will be explained below. As such, it is not difficult to understand why the Defendants opted to reject the multiple offers of payment that were made by Mrs. Peyton and her daughter Kimberly at their home. Indeed, Todd Lesesne, Assistant Manager for the Pittsburgh Municipal Court, explained the process for the collection of unpaid parking tickets and noted that constables are permitted to take personal checks, but are not required to do so; such a decision is left at their discretion. (TT, pp. 153-54, 162, 214). He further explained that constables do not like to accept checks because it directly affects the timing of when they get paid. (TT, pp. 153-55). Specifically, constables do not get paid "until and unless the check clears" so it is "against their financial interest to take a check." (TT, pp. 155-57).

The Allegheny Constable Payment Form (Defense Exhibit A) also indicates that the constables are paid more if they physically bring someone to the Pittsburgh Municipal Court to make payment on an outstanding ticket. (TT, pp. 157-58). As Mr. Lesesne explained, "the constable fees would be higher" in that scenario "because

16

there's more services being performed rather than if payment is collected at the defendant's home or [] residence." (TT, pp. 158, 161). Specifically, the constables receive a $25 fee to execute the warrant by transporting the defendant to the municipal court as well as a $2.50 fee for returning the warrant to the court in that situation. (TT, p. 158). The constables also receive an additional fee to account for the mileage incurred by transporting the defendant to court. (TT, p. 159).

Accordingly, the Defendants could claim additional fees by hauling Mrs. Peyton to municipal court even though she was willing and able to make payment at her house. In this court's estimation, the Defendants clearly violated the summary arrest policy and procedure set forth in the Constable Handbook and in Pa. R. Crim. P. 431(B)(1)(c). However, even though the arrest and transport to court was unnecessary given Mrs. Peyton's ability to pay, the court wishes to be **crystal clear** that Defendants' convictions did **not** stem solely from fact that they merely violated any policy or procedure. Indeed, as explained in detail below, the Defendants' convictions were a product of their hyper-aggressive conduct and their gross mistreatment of Mrs. Peyton in the course of their duties.

### B. The Verdict was not Against the Weight of the Evidence, and the Evidence was more than Sufficient to Sustain the Defendants' Convictions.

It is well established that a "challenge to the sufficiency of the evidence is entirely distinct from a challenge to the weight of the evidence." Commonwealth v. Smith, 853

17

A.2d 1020, 1028 (Pa. Super. 2004). Our appellate court has explained the "critical"

distinction as follows:

> A claim challenging the sufficiency of the evidence, if granted, would preclude retrial under the double jeopardy provisions of the Fifth Amendment to the United States Constitution, and Article I, Section 10 of the Pennsylvania Constitution, whereas a claim challenging the weight of the evidence if granted would permit a second trial.

> A claim challenging the sufficiency of the evidence is a question of law. *Evidence will be deemed sufficient to support the verdict when it establishes each material element of the crime charged and the commission thereof by the accused, beyond a reasonable doubt.* Where the evidence offered to support the verdict is in contradiction to the physical facts, in contravention to human experience and the laws of nature, then the evidence is insufficient as a matter of law. *When reviewing a sufficiency claim the court is required to view the evidence in the light most favorable to the verdict winner giving the prosecution the benefit of all reasonable inferences to be drawn from the evidence.*

> A motion for new trial on the grounds that the verdict is contrary to the weight of the evidence, concedes that there is sufficient evidence to sustain the verdict. Thus, the trial court is under no obligation to view the evidence in the light most favorable to the verdict winner. An allegation that the verdict is against the weight of the evidence is addressed to the discretion of the trial court. A new trial should not be granted because of a mere conflict in the testimony or because the judge on the same facts would have arrived at a different conclusion. A trial judge must do more than reassess the credibility of the witnesses and allege that he would not have assented to the verdict if he were a juror. Trial judges, in reviewing a claim that the verdict is against the weight of the evidence do not sit as the thirteenth juror. Rather, *the role of the trial judge is to determine that notwithstanding all the facts, certain facts are so clearly of greater weight that to ignore them or to give them equal weight with all the facts is to deny justice.*

Smith, *supra*, at 1028 (quoting Commonwealth v. Widmer, 744 A.2d 745, 751-52 (Pa.

2000) (emphasis added).

18

## Weight of the Evidence

It is beyond question that "[t]he weight of the evidence is exclusively for the finder of fact, which is free to believe all, part, or none of the evidence, and to assess the credibility of the witnesses . . . . It is not for [the appellate court] to overturn the credibility determinations of the fact-finder." Commonwealth v. Blackham, 909 A.2d 315, 320 (Pa. Super. 2006).

As this court noted at the time of trial, there were two diametrically opposed versions of what transpired on October 14, 2014. A decision in the case turned squarely on a determination of witness credibility. As the fact-finder in this case, this court had ample opportunity to observe the demeanor of each witness. The court paid close attention to the testimony and evidence presented. As is this court's consistent practice, copious notes were taken during the testimony so that the testimony could be meaningfully reviewed and comparisons of testimony made. Ultimately, this court found that Mrs. Peyton and her two (2) daughters were very credible and consistent with their testimony and that their testimony was genuine and worthy of belief. Mrs. Peyton's account was substantially corroborated by her two (2) daughters, as well as her cousin, Officer Deasy.

Mrs. Peyton and Kimberly both testified that they made numerous attempts to make payment at the residence, that there were several different methods of payment available in the house, and that the Defendants never provided them with the amount of the ticket or with an actual opportunity to make any payment. (TT, pp. 36, 75-77, 91,

19

105-06, 108, 115, 119). Mrs. Peyton and Kimberly both confirmed that they were never provided with any paperwork or presented with the actual warrant. (TT, pp. 53, 78, 105). Kimberly and Christina both testified that Defendant Constantini crumpled up and threw the check that Kimberly had attempted to offer. (TT, pp. 107, 144). Mrs. Peyton and Kimberly testified that Defendant Constantini pushed the door open, barged into the house, and threatened to take Mrs. Peyton to jail. (TT, pp. 34-36, 45,103-06). Christina also heard Defendant Constantini threaten to take Mrs. Peyton to jail. (TT, p.142).

Mrs. Peyton, Kimberly, and Christina each testified that Defendant Constantini was the one who handcuffed Mrs. Peyton, and Kimberly corroborated her mother's testimony that Defendant Constantini pulled her backwards and down to the ground. (TT, pp. 37-40, 61, 108-09, 129, 142). Kimberly and Christina both saw Defendant Lowman grab Mrs. Peyton's foot and drag her out of the house, down a step, and onto the landing. (TT, pp. 37-40,109, 113-14,146-47). Kimberly testified that the doormat was outside of the house after her mother was drug outside, and Officer Deasy confirmed that, when he arrived at the residence minutes after the Defendants had left, the indoor mat was outside of the house. (TT, pp. 110, 168). Furthermore, Officer Deasy testified that, when he arrived at city court, he saw that Mrs. Peyton's hands were incredibly red, and he noticed that the handcuffs were "very tight on her wrists." (TT, p. 174).

The evidence also established that Mrs. Peyton was deliberately placed into the vehicle improperly because she was positioned on her side, and no attempt was made

20

by the Defendants to have her sit upright or to secure her with a seatbelt. (TT, pp. 44, 88, 300, 391-92). This seating position was contrary to mandated policy and directly placed Mrs. Peyton in danger of serious bodily injury because it put her at risk of "positional asphyxiation." (TT, pp. 409-10). As Detective Parker explained, positional asphyxiation occurs when an individual who is handcuffed with their hands behind them and who is not secured with a seatbelt falls facedown and is unable to adjust themselves. (TT, p. 409). In that situation the individual may experience difficulty breathing and may even die. (TT, p. 409).

Although the Defendants relayed a *radically* different story at trial, the court found their testimony to be contrived, self-serving, not credible, and completely unworthy of belief. Indeed, this court had little troubling rejecting their accounts as the Defendants came across as disingenuous, sarcastic, combative, and arrogant. The court also personally witnessed flashes of their temper flare throughout their testimony, particularly with Defendant Lowman's testimony.

The Defendants claimed that Mrs. Peyton was the individual responsible for escalating the situation because her behavior was so irrational, hysterical and uncontrollable that it justified the amount of force that was used. They testified that Mrs. Peyton answered the door, told them that Esther Peyton was not home, and told them they could leave the paperwork with her. (TT, pp. 280-81, 344). They claimed that she then said "my dog, my dog", after which she shut and locked the door. (TT, pp. 281, 344). Defendant Lowman continued to speak with Mrs. Peyton through the door and

21

told her that they needed to see her identification. (TT, pp. 281, 345). Defendant Lowman testified that he then went to secure the back of the house. As he reached the back of the house, he saw Mrs. Peyton standing at the back door with her hands on her dog's collar. (TT, pp. 282-83, 322-23, 345). Defendant Lowman claimed that the dog began growling and ran at him. Defendant Lowman testified that, in the process of him running from the dog, he retrieved his firearm and had his finger on the trigger. (TT, pp. 283-84). Defendant Lowman also acknowledged that the dog was on a chain. (TT, pp. 284, 347).

While Defendant Lowman was at the back of the house, Defendant Constantini testified that Mrs. Peyton came back to the front door with a cell phone. (TT, p. 347). Defendant Constantini testified that he told her that "this is not anything serious. This is just, you know, for traffic. I just need you to sign some paperwork." (TT, p. 347). He claimed that Mrs. Peyton said "You can't arrest me, You have to talk to this person" and then handed her phone to him. (TT, p. 347). Defendant Constantini testified that he took the phone and opened the door just wide enough to gain entry. (TT, p. 348). He claimed that Kimberly Peyton appeared, asked what was going on, and confirmed that Esther Peyton was the female he and Defendant Lowmanthat had been interacting with at the door. (TT, pp. 348-49). Defendant Constantini stated that Mrs. Peyton "immediately ran down the hallway" and into her kitchen. (TT, p. 349). She was sitting at the kitchen table when he entered the room. (TT, p. 349). Defendant Constantini then told Defendant Lowman to come back to the front of the house. (TT, pp. 285, 349).

22

Before Defendant Lowman entered the house, Defendant Constantini testified that he tried to explain to Mrs. Peyton that "This is just a ticket. It's nothing serious. You're not going to jail. I just need you to plead guilty or not guilty and we'll be out of here in a couple of minutes." (TT, pp. 349-50). He claims that Mrs. Peyton responded by saying "I don't have any tickets. I'm not going anywhere. I'm not paying for anything." (TT, p. 350). At that point, Defendant Lowman entered the kitchen and presented Mrs. Peyton with the warrant. (TT, pp. 286-89, 326, 350).

Defendant Lowman testified that he explained to Mrs. Peyton that she could "either pay the fines here or we bring you downtown in front of a judge and get you on a payment plan." (TT, p. 288-89). Defendant Lowman testified that Mrs. Peyton "just kept saying 'I don't have any warrants. I don't have any warrants.'" (TT, p. 289). Defendant Lowman claims that he told Mrs. Peyton that the amount for the unpaid ticket would be "around $200." (TT, pp. 331, 333, 337, 350). Defendant Constantini testified that after Defendant Lowman showed Mrs. Peyton the warrant, Mrs. Peyton "continued to be uncooperative" and "wouldn't acknowledge the warrant." (TT, p. 350). The Defendants also testified that Mrs. Peyton put "both of her hands behind her back, and started to [] slide under the table" in order to avoid being handcuffed. (TT, pp. 289, 351). Defendant Constantini claimed that Defendant Lowman repeatedly "tried to show her the warrant" but "she would just turn her head, kind of like lash away. She was kind of like yelling, but there weren't really any legible words." (TT, p. 352).

23

Defendant Constantini testified that Defendant Lowman tried to plead with her for "about a minute" and then told Mrs. Peyton "If you're not going to pay this, you're not going to sign anything or cooperate, I don't' have any other choice but to take you to Municipal Court Building and you're going to have to see a judge about this." (TT, p. 352). Defendant Lowman claims that he went to handcuff Mrs. Peyton behind her back because she had her "fingers interlocked behind her back." (TT, pp. 289, 327, 352). Defendant Lowman asked Defendant Constantini to help him stand her up and they each were holding on to one of her arms. (TT, p. 290).

Defendant Lowman claimed that Mrs. Peyton was pushing backwards and refusing to walk. (TT, p. 291). Defendant Lowman testified that Mrs. Peyton finally told them "I'll pay. I'll pay. I have money upstairs" and he said "Okay, Well let's go get it." (TT, pp. 291, 355). The Defendants claimed that after they offered to allow her to go get money, "nothing happened" and nobody moved. (TT, p. 355). The Defendants testified that Kimberly approached Defendant Lowman and was waving a white piece of paper in his face that did not look like a check, asking if she could pay with a check. (TT, pp. 292, 327-28, 353). Defendant Lowman told her they do not accept checks, but that they accept cash or money orders. (TT, pp. 292, 329, 354). Defendant Constantini testified that he never touched the paper that was in Kimberly Peyton's hand. (TT, p. 354).

As they approached the front door, Mrs. Peyton allegedly "dropped straight down" to the ground and told them that they were not going to take her "out of the house

24

like a dog" in front of her neighbors. (TT, pp. 292, 355). The Defendants testified that she was "on her knees sitting on her feet" and that they kept telling her to stand up and walk, but that she refused. (TT, pp. 293, 356). Defendant Lowman asked Defendant Constantini for assistance in standing her up, but she kept resisting. (TT, pp. 293-94, 356). Defendant Lowman told Mrs. Peyton to "quit acting like this in front of the kids" because the kids were crying at that point. (TT, pp. 294, 357). He claimed that Mrs. Peyton then laid down on her right shoulder and kicked him in his right shin with her right foot. (TT, pp. 294-95, 357). Defendant Lowman claimed that he went to grab her foot because she started doing "a bicycle kick" and "both legs were kicking." (TT, p. 295). As he bent down to grab her foot, he claims that she then kicked him in the chest. (TT, pp. 295, 357). The Defendants denied that Mrs. Peyton was pushed down or dragged across the floor and out of the house. (TT, pp. 357-58).

Defendant Lowman also claimed that Kimberly Peyton "jumped around behind" him and demanded that they leave her mother alone. (TT, pp. 296, 358). Kimberly allegedly shut the front door, and the Defendants told her to "get away from the door" or else she was "going to go too" because she was "hindering apprehension." (TT, pp. 296, 358). Defendant Lowman claims that Mrs. Peyton agreed to stand up and walk while they were still in the entryway of the house. (TT, p. 297). The Defendants testified that they gave Mrs. Peyton one more chance to pay and offered to let her "go upstairs and get the money," but Mrs. Peyton refused to respond and just continued to cry. (TT, pp. 297, 359). Defendant Lowman then told her "if you're not going to talk to me, I can't help you. Let's go." (TT, pp. 297-99). Defendant Lowman said that he asked

25

Mrs. Peyton one more time if she wanted to go get cash when they got to the car. (TT, pp. 299, 359). Defendant Lowman testified that he gave Mrs. Peyton a total of four (4) opportunities to pay the ticket before she was placed inside of the vehicle, but she refused each time. (TT, pp. 298-99). He also stated that no one ever offered to go to an ATM to retrieve cash. (TT, p. 335).

The Defendants testified that Mrs. Peyton was the one who dropped over to her left side and was laying down in the back of the car, and that they tried to tell her to sit up numerous times. (TT, pp. 300, 359). They claimed that they could not secure her with a seat belt because they were afraid she would bite or spit on them. (TT, pp. 300, 392). They were also afraid she would kick out the back window. (TT, p. 392). Defendant Lowman testified that she never spoke to them in the car, and she just cried the entire time. (TT, p. 300). Defendant Lowman testified that, when they got to city court, they uncuffed her and put her in a waist chain belt. (TT, pp. 302, 367). Defendant Lowman then went to take care of some paperwork and did not go into the courtroom at all. (TT, pp. 303, 367).

After observing the witnesses and their demeanor, this court completely rejected the Defendants' version of what transpired at the home as not credible and fabricated. The court found it illogical that Mrs. Peyton would behave so hysterically and irrationally, much less in the presence of her own children and grandchild. It also found completely lacking in credibilty that she would rather be taken into custody than comply with the Defendants' supposed multiple attempts to obtain payment from her. The court also did

26

not believe that the Defendants provided her with multiple opportunities to make payment at her residence, nor did the court believe that the Defendants were as calm and accommodating as they claimed to have been. Based on the testimony provided by the Peyton family, the Defendants were overly aggressive and escalated the situation into an unacceptably hostile encounter which resulted in the gross mistreatment of Mrs. Peyton.

The court notes that Defendant Constantini's testimony was inconsistent with his own statement that he prepared on October 15, 2014 at 3:15 a.m. and e-mailed to Detective Parker. (Commonwealth's Exhibit 12). Among the multiple inconsistent and not credible statements contained therein were the following: (1) Mrs. Peyton told the Defendants that "she did not have any money on her;" (2) she "began screaming and thrashing about" in the presence of her children; (3) Kimberly "made multiple attempts to remove [Mrs. Peyton] from custody"; (4) Mrs. Peyton kicked Defendant Lowman "in the chest leaving a shoe print on his uniform shirt;" (5) Kimberly "grabbed the right arm" of Defendant Lowman; (6) medical treatment was offered to Mrs. Peyton two (2) times before she was brought inside of the courtroom; and (7) multiple attempts were made to explain to Mrs. Peyton where she was being transported. (Commonwealth's Exhibit 12).

This court remains steadfast in its belief that Mrs. Peyton and her daughters provided a truthful, genuine, and compelling account of the events that took place. Their testimony convinced this court that the Defendants: (1) never showed Mrs. Peyton

27

any kind of paperwork; (2) never provided an opportunity to make payment at the home despite the multiple methods of payment that were available to them; (3) never informed anyone of the amount for the ticket; and (4) repeatedly threatened that Mrs. Peyton was going to jail. The court also believed the testimony that Mrs. Peyton was pulled down and physically dragged out of her house by her foot.

The Defendant's attempt to challenge the weight of the evidence is nothing more than an attempt to attack this court's credibility determinations. This court respectfully urges the appellate court to decline the Defendants' invitation to second-guess its credibility assessments. Accordingly, based on the testimony of the Commonwealth witnesses, the verdict was not against the weight of the evidence and the verdicts should, therefore, be upheld.

*Sufficiency of Evidence*

As set forth above, the evidence presented at trial, viewed in the light most favorable to the Commonwealth as verdict winner, was sufficient to establish beyond a reasonable doubt that the Defendants were guilty of Simple Assault, Recklessly Endangering Another Person, Official Oppression, and Criminal Conspiracy.

The Simple Assault statute set forth in 18 Pa. C.S.A. § 2701(a) states that "[a] person is guilty of assault if he: (1) attempts to cause or intentionally, knowingly, or recklessly causes bodily injury to another." 18 Pa. C.S.A. § 2301 defines "bodily injury"

28

as "[i]mpairment of physical condition or substantial pain." Regardless of whether the Defendants had a valid basis to arrest Esther Peyton, they committed a simple assault upon her when: (1) Defendant Constantini put the handcuffs on Mrs. Peyton so tightly that it caused her a substantial amount of pain and redness and potentially permanent numbness on her wrists; (2) Defendant Constantini pulled her down to the ground as she was walking out of the kitchen which caused her to fall on her hands and rear-end; and (3) Defendant Lowman grabbed her foot and dragged her across the entryway, out the front door, over a step, and onto the landing. The Defendants actions were intentional, and they constituted a substantial step in attempting to cause bodily injury on Mrs. Peyton. The Defendant's actions cannot be viewed as incidental contact attendant to a lawful arrest because Mrs. Peyton was not resisting arrest or attempting to struggle with the Defendants. It was the Defendants who chose to behave aggressively with their gross mishandling and mistreatment of Mrs. Peyton.

Furthermore, the court notes that the significant amount of pain Mrs. Peyton felt after the incident caused her to seek medical treatment that very night for numbness and potential nerve damage. Photographs taken on the same day of the incident also demonstrated that she had bruises on her arms and wrists. (Commonwealth Exhibits 1 through 7). The Defendants' actions completely transcended the bounds of a lawful arrest and evinced an actual intention to cause bodily injury to Mrs. Peyton when they pulled her down, grabbed her foot, and dragged her out of the house.

29

A person is guilty of Recklessly Endangering Another Person ("REAP") "if he recklessly engages in conduct which places or may place another person in danger of death or serious bodily injury." 18 Pa. C.S.A. § 2705. Our law defines "serious bodily injury" as "bodily injury which creates a substantial risk of death or which causes serious, permanent disfigurement or protracted loss or impairment of the function of any bodily member or organ." To sustain a REAP conviction, "the Commonwealth must prove that the defendant had an actual present ability to inflict harm and not merely the apparent ability to do so. Danger, not merely the apprehension of danger, must be created. The *mens rea* for recklessly endangering another person is 'a conscious disregard of a known risk of death or great bodily harm to another person.'" Commonwealth v. Hopkins, 747 A.2d 910, 915-916 (Pa. Super. 2000) (citations and quotation omitted).

The evidence was sufficient to sustain the Defendants' convictions for REAP because their actions placed Mrs. Peyton in great danger of serious bodily injury. Mrs. Peyton was a fifty (50) year old woman who was handcuffed, purposefully pulled down to the ground, and not only physically dragged across her floor, but dragged outside and down an actual step. As noted above, the Defendants also placed her in danger of serious bodily injury when they put her in the back of the vehicle on her side, did not instruct her to sit up, did not secure her with a seat belt, and ignored her pleas from the backseat of the vehicle that she was having difficulty breathing.

30

The Defendants actions were incredibly reckless and created a serious and dangerous situation where Mrs. Peyton could have suffered serious bodily harm from the manner in which they arrested her. The "Commonwealth need only establish that the defendant's conduct placed or *may have placed* another in *danger* of serious bodily injury or death." Commonwealth v. Vogelsong, 90 A.3d 717, 721 (Pa. Super. 2014) (quoting Commonwealth v. Cordoba, 902 A.2d 1280, 1288–1289 (Pa. Super. 2006) (emphasis in original). The Defendants' actions unquestionably may have placed Mrs. Peyton in danger of seriously injuring her back, tail bone, etc., and they could have caused even more damage to her arms and wrists since they were behind her back as she was being pulled outside by her foot.

The evidence is also more than sufficient to establish that the Defendants are guilty of Official Oppression as set forth in 18 Pa. C.S.A. § 5301. The statute defines Official Oppression as follows: "A person acting or purporting to act in an official capacity or taking advantage of such actual or purported capacity commits a misdemeanor of the second degree if, knowing that his conduct is illegal, he:

> (1) subjects another to arrest, detention, search, seizure, **mistreatment,** dispossession, assessment, lien or other infringement of personal or property rights; or

> (2) denies or impedes another in the exercise or enjoyment of any right, privilege, power or immunity.

18 Pa. Cons. Stat. § 5301. The court in Commonwealth v. Checca, 491 A.2d 1358 (Pa. Super. 1985), recognized that "the statute was **broadly drafted** to include all opportunities for oppressive use of official power," and it specifically found that the statute applies to "**aggressive action against the individual.**" (citations omitted).

31

Thus, regardless of whether the arrest warrant provided the Defendants with authority to take Mrs. Peyton into custody, the Defendants grossly abused their power by choosing to take her into custody despite her ability to make payment at the residence, and that fact, combined with the hyper-aggressive manner in which the arrest was effectuated, rose to the level of official oppression. As detailed earlier, the Defendants' drew their firearm in the backyard, barged into the house, repeatedly threatened that they were going to take Mrs. Peyton to jail despite knowing they could only take her to municipal court, handcuffed her behind her back, repeatedly refused to allow her to make any form of payment despite the multiple offers that were made and despite her ability to do so, pulled her down to the ground, and quite literally dragged a fifty (50) year old woman out of her house, all in the presence of her children and grandchild, and all within a matter of five (5) minutes.

The court completely rejects the Defendants' version of events, and it found that they never attempted to calmly and rationally explain the situation as they so claimed. The Defendants' aggressive actions, in combination with the Defendants' ability to simply accept the payment that was being offered in lieu of arrest, constituted a gross mistreatment of Mrs. Peyton and a gross abuse of their power that cannot be tolerated.

Finally, the evidence was sufficient to prove the Defendants guilty of Conspiracy to Commit Official Oppression because the Defendants clearly were acting in concert. Their words and actions demonstrated a united effort to behave aggressively and grossly abuse their constable power by mistreating Mrs. Peyton in the manner

32

described above. Neither Defendant attempted to de-escalate the situation. They made repeated and empty threats to take Mrs. Peyton to jail, despite being well-aware that they were only taking her to municipal court. The Defendants certainly did not behave like "peace officers". The manner in which they executed the arrest warrant was egregious– regardless of their authority to effectuate an arrest.

## III.    **CONCLUSION**

This court did not misapply the facts or misinterpret the law in finding the Defendants guilty. The verdict was not against the weight of the evidence, and the evidence was more than sufficient to sustain the Defendants' convictions.

BY THE COURT:

BETH A. LAZZARA, JUDGE

4/29/16

DATE